1

1             UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2                FORT PIERCE DIVISION
               CASE NO.  17-14009-CR-JEM
3

4     UNITED STATES OF AMERICA,

5                 Plaintiff,

6         vs.

7                                     Fort Pierce, Florida
                                      January 18, 2018
8     RALPH ROBERT JAMES SERGO,       Pages 1-43
                                      10:45 a.m. - 11:57 a.m.
9                 Defendant.
      _____

10

11              TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE JOSE E. MARTINEZ
12               UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    FOR THE PLAINTIFF:
                          *United States Attorney's Office*
15                        BY:  CARMEN LINEBERGER,  A.U.S.A.
                          101 South US Highway 1
16                        Suite 3100
                          Fort Pierce,  Florida 34950
17
      FOR THE DEFENDANT:
18                        BY:  ROBERT B. MEADOWS, ESQ.
                          2145 14th Avenue
19                        Suite 24
                          Vero Beach, Florida 32960
20
                          BY:  JASON MATTHEW WANDNER, ESQ.
21                        100 North Biscayne Boulevard
                          Suite 1607
22                        Miami, Florida 33132

23    Also present:

24                        Edward Cooley, US Probation Office

25

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED BY COMPUTER

```
1    REPORTED BY:        DAWN M. SAVINO, RPR, CRR
                         Official Federal Court Stenographer
2                        400 N. Miami Avenue, 10S03
                         Miami, Florida  33128
3                        Telephone:  305-523-5598
```

4

5                          P-R-O-C-E-E-D-I-N-G-S

10:45:29  6          COURTROOM DEPUTY:  Case Number

10:45:35  7    17-14009-criminal-Martinez, United States of America versus

10:45:37  8    Ralph Robert James Sergo.

10:45:40  9          Counsel, please state your appearances.

10:45:41  10         MS. LINEBERGER:  Good morning, Your Honor. Carmen

10:45:44  11   Lineberger on behalf of the Government.

10:45:45  12         THE COURT:  Good morning, Ms. Lineberger.

10:45:47  13         MR. WANDNER:  Good morning, Judge.  Jason Wandner on

10:45:49  14   behalf of the Defendant.

10:45:51  15         MR. MEADOWS:  Good morning, Your Honor.  Bob Meadows on

10:45:53  16   behalf of the Defendant.

10:45:53  17         THE COURT:  Good morning, gentlemen.

10:45:55  18         All right.  We're here on the sentencing.  I've

10:45:58  19   reviewed the stipulated factual proffer and written plea

10:46:01  20   agreement.  The presentence investigation.  Note that the

10:46:05  21   Defendant requests designation to a facility as close to the

10:46:10  22   Orlando area as possible, and if I don't mention it again, it

10:46:12  23   will be in my formal order.  Note that there has been an

10:46:13  24   adjustment for acceptance of responsibility.

10:46:16  25         I've reviewed the letters on behalf of the Defendant.

| | |
|---|---|
| 10:46:22 | 1 |
| 10:46:26 | 2 |
| 10:46:31 | 3 |
| 10:46:32 | 4 |
| 10:46:36 | 5 |
| 10:46:39 | 6 |
| 10:46:42 | 7 |
| 10:46:43 | 8 |
| 10:46:46 | 9 |
| 10:46:48 | 10 |
| 10:46:50 | 11 |
| 10:46:52 | 12 |
| 10:46:54 | 13 |
| 10:46:57 | 14 |
| 10:47:01 | 15 |
| 10:47:04 | 16 |
| 10:47:07 | 17 |
| 10:47:09 | 18 |
| 10:47:11 | 19 |
| 10:47:14 | 20 |
| 10:47:16 | 21 |
| 10:47:21 | 22 |
| 10:47:27 | 23 |
| 10:47:31 | 24 |
| 10:47:33 | 25 |

I've also reviewed the Government's sealed 5K1.1 motion for downward departure, the Defendant's sentencing memorandum, preliminary order of forfeiture, the addendum to the Presentence Investigation.

Now, there was some talk about it being under seal. Did you figure out how to file something under seal?

MR. WANDNER:  Judge, we're going to prepare filing a sentencing memorandum which --

THE COURT:  I don't see anything in there that's worthy of it being under seal.

MR. WANDNER:  Well Judge, it was an abundance of caution because the Government's 5K was filed under seal, the issue of the cooperation.

THE COURT:  I don't know why a 5K would be filed.  I mean, it has no details in it.  It has nothing in it.  Is there a necessity for yours -- I just don't want to put the clerk's office out for putting something under seal that doesn't have to be under seal.

MR. WANDNER:  I can file it in the normal course.

THE COURT:  Do you care if the 5K1 is under seal?

MS. LINEBERGER:  I do, Your Honor, because this is a dark net case, and individuals on the dark net do go online to find things about people that are arrested, and it could affect the Defendant's -- wherever he ends up.

THE COURT:  I don't care, but I just hate to have

10:47:37  1     something -- how long do you want it to be under seal?

10:47:40  2          MS. LINEBERGER:  Until further order of the court.

10:47:41  3          THE COURT:  No, because then I got to remember to tell

10:47:46  4     you to move for it.  I'll put it for six months.  That's it.  If

10:47:49  5     you want it to be more than that, you'll have to do it more than

10:47:53  6     that.  If you file your motion, yours will be also sealed for

10:47:57  7     six months, and then it will be unsealed unless somebody files a

10:48:00  8     motion for it to be sealed further.

10:48:01  9          MS. LINEBERGER:  Your Honor, could it be at least

10:48:05 10     extended to 18 months?

10:48:09 11          THE COURT:  Okay.  I'll do 18 months and then it will

10:48:11 12     be automatically unsealed.  All right?

10:48:16 13          Are we ready to proceed at this time?  Let me hear from

10:48:22 14     the -- I'll grant the Government's 5K1.1 motion, and I will be

10:48:25 15     happy to hear -- let me get an appearance from Probation.  I

10:48:28 16     don't see you behind my monitor.

10:48:29 17          THE PROBATION OFFICER:  Good morning, Your Honor.

10:48:32 18     Edward Cooley for United States Probation.

10:48:33 19          THE COURT:  Mr. Cooley.

10:48:35 20          All right.  I'm ready to proceed at this time.  Let me

10:48:38 21     hear first from the government as to what you believe an

10:48:41 22     appropriate sentence would be in this case.

10:48:46 23          MS. LINEBERGER:  Your Honor, first I would like to

10:48:51 24     address claims made by the defense in their memorandum.  First

10:48:56 25     of all, for the record, there's nothing wrong with or defective

10:49:00  1    with the plea agreement in this case or the indictment in this

10:49:05  2    case.  It is properly charged, and the government has felt there

10:49:11  3    were no nonfrivolous reasons to succumb to the arguments of the

10:49:15  4    defense.  Defense argues there was something wrong with the

10:49:17  5    indictment, because the second firearms charge did not

10:49:24  6    specifically denote the section requiring the 25-year mandatory.

10:49:27  7    There is Eleventh Circuit case law directly on point where the

10:49:32  8    government does not have to allege that sentencing enhancement

10:49:37  9    in the indictment.  And I would note that the defense in their

10:49:42  10   memorandum cites no case law, but tries to fault the government.

10:49:45  11         Moving on, Your Honor, the government is following laws

10:49:48  12   set by Congress and if the defense has a problem with the law,

10:49:54  13   they need to address it to Congress.  The Defendant has been

10:50:01  14   fully aware from the arraignment and the reading of the penalty

10:50:04  15   sheet, as well as his plea agreement, what he was facing as far

10:50:08  16   as sentencing was concerned if he pled to all the charges, and

10:50:13  17   the strength of the government's case as set forth in the

10:50:18  18   stipulated factual basis.  He knew what, if any, value his

10:50:24  19   information to the government would hold, and how long it would

10:50:28  20   take the government to be able to conduct an investigation that

10:50:34  21   was fruitful.  This is a dark web case.  This isn't a "corner of

10:50:39  22   US One and Orange Avenue" case where someone is selling crack or

10:50:45  23   heroin or molly on the street to be observed, Your Honor, which

10:50:52  24   moves me into the 3553 factors in this matter.

10:50:55  25         The government is asking the Court -- and has filed the

10:51:03  1    motion under 5K1.1 and also the 3553(e) factors, the government

10:51:11  2    is asking the Court to sentence the Defendant to 50% of the

10:51:17  3    original mandatory minimum, and I'm asking you at this time to

10:51:22  4    sentence him to 20 years imprisonment followed by a lifetime of

10:51:25  5    supervised release.  And I'm asking for that amount and not

10:51:32  6    lower at this time because, Your Honor, we did file the downward

10:51:34  7    departure motion.

10:51:38  8          His substantial assistance is minimal at best at this

10:51:45  9    time.  Everything he's given us thus far is subject to being

10:51:52  10   investigated.  Investigation is ongoing, but his information did

10:51:59  11   lead us to find his Bitcoin, which we did seize, and we're

10:52:05  12   giving him credit for helping us in that investigation which

10:52:09  13   could have taken quite a bit longer and was somewhat a financial

10:52:12  14   investigation apart from the drug investigation.

10:52:17  15         Getting to the 3553 factors and why the Court should go

10:52:22  16   no lower than 20 years imprisonment at this time, the government

10:52:26  17   would draw the Court's attention to the nature and circumstances

10:52:34  18   of the offense.  Your Honor, the Defendant, in LSD alone, giving

10:52:40  19   all benefit to the Defendant, he possessed -- he either

10:52:46  20   attempted to import it, he did import it, possessed it with

10:52:52  21   intent to distribute and exported a total amount or attempted to

10:53:01  22   export 24,812 doses of LSD.  And I say giving the benefit of the

10:53:05  23   doubt to the Defendant because you'll recall from the

10:53:11  24   presentence report that there was a portion of LSD seized that

10:53:15  25   did not get weighed by the lab and it was not even counted

10:53:27  1   against him.  Those separate seizures resulted in three separate

10:53:32  2   mandatory minimum sentence counts; one for 5 to 30, one for 10

10:53:34  3   to life --

10:53:39  4            THE COURT:  What are the three separate offenses now?

10:53:40  5   Three separate seizures?

10:53:43  6            MS. LINEBERGER:  The three separate seizures are the

10:53:47  7   October 11, 2016 box in the mail.

10:53:48  8            THE COURT:  Okay.

10:53:53  9            MS. LINEBERGER:  5.93 grams of LSD which equate to

10:53:57  10  14,825 doses.

10:54:03  11           The execution of the search warrant at the Defendant's

10:54:09  12  home January 17, 2017, where at his home there was the unknown

10:54:16  13  amount of LSD, and then the amount that equated to 4,850 doses.

10:54:25  14  And then separately on that date, January 17, 2017, the package

10:54:31  15  that the Defendant was attempting to export from Martin County

10:54:39  16  to Mexico contained 5,312 doses of LSD.

10:54:41  17           THE COURT:  Somebody is trying to sell drugs to Mexico

10:54:42  18  now?

10:54:44  19           MS. LINEBERGER:  LSD, yes.

10:54:46  20           THE COURT:  Okay.  I believe you.  I just don't

10:54:49  21  understand why someone would do that.

10:54:51  22           MS. LINEBERGER:  As if it wasn't bad enough there

10:54:55  23  already, they're adding LSD to whatever else might be there,

10:54:56  24  Your Honor.

10:55:01  25           But in addition to those drugs, the Defendant had

| | | |
|---|---|---|
| 10:55:05 | 1 | firearms on the same date under two different circumstances, |
| 10:55:12 | 2 | which is what led to the charging of the five-year mandatory |
| 10:55:12 | 3 | minimum. |
| 10:55:15 | 4 | THE COURT:  He had one under the seat of his car and |
| 10:55:16 | 5 | one under his bed, correct? |
| 10:55:18 | 6 | MS. LINEBERGER:  He had several throughout his home. |
| 10:55:21 | 7 | THE COURT:  Okay.  But he had one under his car. |
| 10:55:22 | 8 | MS. LINEBERGER:  Under the seat. |
| 10:55:24 | 9 | THE COURT:  And one under his bed, correct? |
| 10:55:24 | 10 | MS. LINEBERGER:  Yes. |
| 10:55:27 | 11 | THE COURT:  Okay.  And then he had others at the house? |
| 10:55:28 | 12 | MS. LINEBERGER:  Yes, he did, Your Honor. |
| 10:55:30 | 13 | THE COURT:  No, I read the thing.  I know.  I'm |
| 10:55:32 | 14 | listening. |
| 10:55:34 | 15 | MS. LINEBERGER:  Your Honor, so the Defendant had |
| 10:55:40 | 16 | firearms protecting his LSD business and his cash, not only at |
| 10:55:46 | 17 | home but when he left St. Lucie County going to the mail Post |
| 10:55:52 | 18 | Office in Martin County, on the highways with him, protecting |
| 10:55:56 | 19 | him, his drugs and his cash. |
| 10:56:01 | 20 | I'd also draw the Court's attention under this first |
| 10:56:05 | 21 | section, nature and circumstances of the offense, that the |
| 10:56:12 | 22 | Defendant was using a sham corporation known as LeBowe, LLC.  He |
| 10:56:17 | 23 | was having his package delivered to that -- in the name of that |
| 10:56:21 | 24 | corporation, whereas before he was getting packages in his own |
| 10:56:27 | 25 | name.  So he went to extra steps to conceal what he was doing. |

| | | |
|---|---|---|
| 10:56:30 | 1 | In addition, Your Honor, he was concealing assets in |
| 10:56:35 | 2 | the name of LeBowe, LLC, the property that he purchased during |
| 10:56:40 | 3 | the time he was involved in narcotics trafficking.  He used the |
| 10:56:44 | 4 | dark web to cloak his activities.  He used operational |
| 10:56:49 | 5 | securities to cloak his activities from law enforcement, online, |
| 10:56:55 | 6 | the dark web.  He hid assets in the form of Bitcoins with |
| 10:57:01 | 7 | passwords to shield it from law enforcement. |
| 10:57:03 | 8 | I'd also draw the Court's attention to the length of |
| 10:57:09 | 9 | time the Defendant successfully eluded law enforcement, and I'd |
| 10:57:15 | 10 | ask the Court to also think about the amounts he likely |
| 10:57:24 | 11 | trafficked in the time span of three to four years.  Your Honor, |
| 10:57:31 | 12 | our time span, if we count the one box of MDMA, goes from July |
| 10:57:39 | 13 | 2015 to January of 2017, so that's less than two years right |
| 10:57:48 | 14 | there, and the amount of LSD and the amount of MDMA seized. |
| 10:57:51 | 15 | Your Honor, we have him distributing, we have him |
| 10:57:57 | 16 | importing, we have him exporting.  There are not only county |
| 10:58:01 | 17 | consequences on the local and county level, we have |
| 10:58:07 | 18 | international consequences to the drug activity, as well as |
| 10:58:12 | 19 | nationwide consequences to his drug activity.  And I bring that |
| 10:58:16 | 20 | to the Court's attention because he was mass marketing via the |
| 10:58:21 | 21 | dark web, and that is something the Court can take into account |
| 10:58:28 | 22 | and can use as an aggravator.  The fact that he was importing |
| 10:58:31 | 23 | and exporting as opposed to merely possession with intent to |
| 10:58:31 | 24 | distribute -- |
| 10:58:34 | 25 | THE COURT:  How was he marketing through the dark web? |

| | |
|---|---|
| 10:58:36 | 1 |

MS. LINEBERGER:  Online.

10:58:40  2    THE COURT:  What did he do on the dark web that was

10:58:40  3  marketing?

10:58:47  4    MS. LINEBERGER:  He was using the dark web, an internet

10:58:50  5  dark web marketplace, to market his LSD.

10:58:52  6    THE COURT:  What I'm asking is can you tell me at some

10:58:57  7  point he put a notice on the dark web, "LSD, call me"?  I don't

10:58:59  8  mean that exactly, but you know what I mean.  Did he put

10:59:03  9  something on there saying that he was trying to sell LSD?

10:59:05  10    MS. LINEBERGER:  Law enforcement has investigated and

10:59:13  11  found that he went by the name of John within the Jesus of Rave

10:59:20  12  LSD marketing organization, and there is talk all about the dark

10:59:26  13  web on the dark web about this Defendant, his connection to

10:59:30  14  being John on the internet, and how everybody better change

10:59:37  15  their OPSEC planning so that they don't get arrested.

10:59:39  16    THE COURT:  That doesn't really answer my question.

10:59:42  17  Are you telling me that investigation has shown that he

10:59:47  18  advertised on the dark web for sale of LSD?  Or are you telling

10:59:50  19  me that you presume that based on everything else?

10:59:51  20    MS. LINEBERGER:  Your Honor, it's a totality of the

10:59:55  21  circumstances that law enforcement has been able to make the

10:59:56  22  connection.

10:59:56  23    THE COURT:  Okay.

10:59:58  24    MS. LINEBERGER:  That this Defendant was selling on the

11:00:00  25  dark web.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:00:01  1          THE COURT:  Okay.

11:00:05  2          MS. LINEBERGER:  Your Honor, in addition, this

11:00:14  3  Defendant was using his residence, based only on everything

11:00:18  4  found there including the blotter, stacks and stacks of

11:00:22  5  undoctrinated blotter was found in his house where you put the

11:00:27  6  liquid LSD all over the paper and then each little tab is a dose

11:00:32  7  in and of itself.  Now, we didn't find any active LSD in those,

11:00:36  8  but it was certainly there.  He was using his residence for

11:00:41  9  purposes of manufacturing and distributing LSD.  The Court can

11:00:42  10  take that into account as well.

11:00:49  11          He had a toddler, if not infant, wherever that line

11:00:53  12  changes; he had a toddler living in the house around that LSD,

11:00:57  13  around his firearms.

11:01:02  14          With regard to the history and the characteristics of

11:01:06  15  the Defendant, Your Honor, there's a presentence report, there

11:01:08  16  are numerous letters from the community.  Of course, the Court

11:01:14  17  has to take that into account, but that is one side of this

11:01:18  18  Defendant, and I submit to the Court that's the public side.

11:01:24  19  This Defendant was able to successfully operate out of his home

11:01:35  20  and make thousands of dollars by operating on the dark web.  His

11:01:40  21  seemingly innocent look to the public, family and friends was

11:01:45  22  merely one side of him, but the other side was a dark net

11:01:49  23  wheeler and dealer of drugs and he was a drug dealer who used

11:01:56  24  firearms to protect his business.  The residence where he

11:02:02  25  manufactured and packaged the drugs and in his vehicle when he

| | | |
|---|---|---|
| 11:02:07 | 1 | went to the Post Office to mail his drugs, using the US Postal |
| 11:02:11 | 2 | service to deliver his drugs. |
| 11:02:18 | 3 | The defense tries to say, oh, well he's losing all that |
| 11:02:22 | 4 | Bitcoin; the Court should take that into account because that's |
| 11:02:26 | 5 | going to hurt his family.  Well Your Honor, when you conduct an |
| 11:02:32 | 6 | illegal business, you deserve to lose your illegal proceeds.  So |
| 11:02:34 | 7 | that's not a mitigator, Your Honor.  If anything, it's an |
| 11:02:42 | 8 | aggravator that he went to such an extent to hide his assets in |
| 11:02:51 | 9 | Bitcoin and the LLC.  He jeopardizes his own family.  He did |
| 11:02:57 | 10 | that.  The government didn't do it.  So the fact that his family |
| 11:03:01 | 11 | doesn't have illegal proceeds to live off of should not be a |
| 11:03:06 | 12 | mitigator, and the fact that he has to leave his family -- he |
| 11:03:11 | 13 | placed his family in jeopardy.  I would argue we're doing them a |
| 11:03:15 | 14 | favor by getting him, his drugs and his firearms out of the |
| 11:03:17 | 15 | house. |
| 11:03:25 | 16 | His lack of criminal history.  No, he has no criminal |
| 11:03:27 | 17 | history points, that's true, but he was able to operate |
| 11:03:34 | 18 | undetected, under microscope of law enforcement or below |
| 11:03:38 | 19 | microscope of law enforcement between at least three and four |
| 11:03:41 | 20 | years by his own admission. |
| 11:03:44 | 21 | Your Honor, with regard to the seriousness of the |
| 11:03:49 | 22 | offense, I believe I've addressed that already, but this case is |
| 11:03:55 | 23 | atypical as far as this factor is concerned.  The seriousness of |
| 11:04:02 | 24 | the offense.  Because we have thousands and thousands of doses |
| 11:04:10 | 25 | of LSD.  We don't see LSD that much.  I've tried to find cases |

11:04:16  1    comparable and I've been unable to.  I've found one individual

11:04:22  2    that had 20 units and a gun, but not thousands and thousands.

11:04:29  3    Not almost 25,000 doses and a gun, and this Defendant had two

11:04:36  4    incidents with a gun. The difference should not bode in the

11:04:37  5    Defendant's favor.

11:04:41  6             Next, deterrence and protection of the public.  With

11:04:46  7    regard to both types of deterrence and protection of the public,

11:04:51  8    it can be achieved through a 20 year prison sentence followed by

11:04:55  9    a lifetime of supervised release.  This Defendant presents a

11:05:00  10   threat to the community, his country, and other countries by

11:05:06  11   peddling such large quantities of LSD via the internet.  People

11:05:11  12   have good trips on LSD and Your Honor, people have bad trips on

11:05:16  13   LSD.  And the Defendant admits that he was using LSD

11:05:22  14   occasionally and he had these firearms, and he's got children in

11:05:29  15   the house, and he's also taking his firearms out of the house as

11:05:36  16   he goes to mail his LSD.  Others like him that want to follow in

11:05:41  17   his footsteps and think it's a good idea and oh, I can go and be

11:05:47  18   undetected on the dark web, they should be discouraged by this

11:05:52  19   Court's sentence and a message should be sent to them that what

11:05:56  20   happens in the dark will come out in the light eventually, and

11:06:00  21   the light is shining on the darkness that this Defendant was

11:06:06  22   able to operate in under the cloak of the dark web, under the

11:06:13  23   cloak of operational security, or OPSEC as they call it, and

11:06:18  24   under the guise of his LLC formed that even named his mother as

11:06:22  25   a partner, Your Honor.

| | |
|---|---|
| 11:06:27 | 1 |
| 11:06:32 | 2 |
| 11:06:36 | 3 |
| 11:06:44 | 4 |
| 11:06:48 | 5 |
| 11:06:55 | 6 |
| 11:06:58 | 7 |
| 11:07:04 | 8 |
| 11:07:10 | 9 |
| 11:07:14 | 10 |

Promotion of respect for the law.  The Defendant and anyone that was working with him, and our investigation is ongoing, and we don't know where it's going to lead, it could lead to his very household.  They should not think -- he should not think that he can buy his way out of a jail cell.  And this is regarding the forfeiture of the Bitcoin, Your Honor.  The forfeiting of his ill-gotten gains is a must, and he should not feel privileged.  And I would ask that the Court not allow his defense or to take it as a grain of salt for them to argue that he can give up some cash and get out of jail easy in the Southern District of Florida.  Because I've reviewed the memorandum filed late in this case, and that's what it seems like they want to do.  Oh, well he forfeited all this Bitcoin and it's worth so much money.  Well, it's not a "get out of jail free" Bitcoin, Your Honor.  He violated the laws in a number of ways.

And in promoting respect for the law, Your Honor, I would remind the Court that his first package was seized in July of 2015, and that was MDMA.  And that package went to the residence he was renting at the time and it went to his name.  After that package was seized, he changed his mode of operation and then had the packages sent in his LLC's name.  That doesn't indicate a respect for the law, Your Honor.  He continued to violate the law repeatedly after 2015, and I submit he continued with reckless abandon.  Thousands of doses.  And the ability to

11:08:45  1    peddle even blotter, which is even harder to detect because all

11:08:50  2    it is is a sheet of paper and can be put in any envelope.

11:08:53  3         Your Honor, the applicable guidelines by operation of

11:09:00  4    the sentencing guideline commission, they have decided that the

11:09:05  5    guidelines will be what the mandatory minimum is.  The defense

11:09:11  6    wants to argue that his mandatory minimum should be at a level

11:09:18  7    27, prior record score of one.  That's only by operation of the

11:09:24  8    amount of drugs counted in this case.  The government submits

11:09:29  9    the guidelines are still 40 years; however, we're asking the

11:09:34 10    Court to depart downward.  But Your Honor, to just penalize the

11:09:38 11    Defendant for only the drugs and ignore the fact that he had all

11:09:43 12    these guns in his house around his toddler at the residence

11:09:49 13    where he was manufacturing the LSD, and then would take the guns

11:09:55 14    away from his family and perhaps impact others who might have

11:10:00 15    gotten in some kind of argument with him or somehow made him

11:10:04 16    threatened while he's peddling his drugs, taking them to the

11:10:08 17    Post Office, Your Honor, the defense doesn't even -- they're

11:10:13 18    asking you to totally disregard that and use the weight of the

11:10:20 19    LSD alone.  But the weight doesn't give you an idea of the

11:10:28 20    impact until you count the number of doses.  How many trips can

11:10:33 21    be taken with almost 25,000 doses, Your Honor?  That's a lot of

11:10:39 22    LSD, and he was spreading that LSD around the world.  It's

11:10:41 23    clear.

11:10:52 24         I'm asking for 20 years so the Court can give law

11:11:01 25    enforcement the time to put the Defendant to use.  The Defendant

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:11:11 | 1 | has hired a Monday morning quarterback to criticize what the |
| 11:11:12 | 2 | first attorney did in the case -- |
| 11:11:13 | 3 | MR. WANDNER:  Judge, I would object. |
| 11:11:15 | 4 | THE COURT:  That's not necessary.  Move on. |
| 11:11:16 | 5 | MS. LINEBERGER:  And there's a chance that we'll be |
| 11:11:22 | 6 | back in front of you, and there's a chance that I will be able |
| 11:11:28 | 7 | to say yes, the Defendant's information did really amount to |
| 11:11:34 | 8 | something because we were able to use some aspect of the |
| 11:11:38 | 9 | information, maybe not even in the Southern District of Florida, |
| 11:11:42 | 10 | maybe in the district of Minnesota, maybe in one of the |
| 11:11:47 | 11 | California districts, maybe one of the ones in New York or |
| 11:11:53 | 12 | Europe, because that's how widespread this organization was. |
| 11:12:02 | 13 | Give law enforcement enough time to do something with the |
| 11:12:03 | 14 | information. |
| 11:12:07 | 15 | So I'm asking for the 20 years plus lifetime supervised |
| 11:12:14 | 16 | release because we may be back here on a Rule 35.  Right now, |
| 11:12:17 | 17 | there is nothing the Defendant has done that would warrant the |
| 11:12:22 | 18 | Court from going from 40 or 30 all the way down to the |
| 11:12:32 | 19 | guidelines that the Defendant is trying to argue of 70 to 87 |
| 11:12:41 | 20 | months.  It just hasn't happened yet, Your Honor.  And their |
| 11:12:46 | 21 | calculation doesn't take into account all of the factors that I |
| 11:12:52 | 22 | have listed for the Court regarding the Defendant's activities. |
| 11:12:57 | 23 | And I submit they may argue oh well, he's such a nice boy, he's |
| 11:13:04 | 24 | such a nice guy, he's been no trouble, etcetera, but he used his |
| 11:13:10 | 25 | wit for crime.  Thank you. |

| | | |
|---|---|---|
| 11:13:10 | 1 | THE COURT:  Thank you, ma'am. |
| 11:13:13 | 2 | Counsel? |
| 11:13:15 | 3 | MR. WANDNER:  Judge, we have two aspects of our |
| 11:13:21 | 4 | presentation; one legal argument to contravene counsel's |
| 11:13:24 | 5 | argument, and the other would be witnesses on his behalf. |
| 11:13:26 | 6 | THE COURT:  Well, I don't allow witnesses that I've |
| 11:13:29 | 7 | read letters from.  So if you've got somebody that hasn't |
| 11:13:31 | 8 | written me a letter, I'll be happy to hear from them.  Put them |
| 11:13:35 | 9 | on whenever you want, do whatever you want. |
| 11:13:37 | 10 | MR. WANDNER:  We'll put the witness on first and then |
| 11:13:40 | 11 | we'll make argument.  Is that acceptable, Judge? |
| 11:13:43 | 12 | THE COURT:  That's fine.  Whatever you want to do, it's |
| 11:13:44 | 13 | your case. |
| 11:13:47 | 14 | MR. MEADOWS:  If I could have one moment, Your Honor? |
| 11:14:44 | 15 | THE COURT:  Certainly.  Yes, sir. |
| 11:14:49 | 16 | MR. MEADOWS:  Your Honor, there are -- we have reduced |
| 11:14:52 | 17 | our number of witnesses down to five prior to coming in. |
| 11:14:56 | 18 | THE COURT:  I thought he said two. |
| 11:14:58 | 19 | MR. MEADOWS:  There's five witnesses. |
| 11:14:58 | 20 | THE COURT:  Okay. |
| 11:15:03 | 21 | MR. MEADOWS:  They've all been instructed to be brief. |
| 11:15:12 | 22 | The issue here is that letters were written by all but one of |
| 11:15:15 | 23 | these individuals that were going to speak. |
| 11:15:17 | 24 | THE COURT:  Then you've got one. |
| 11:15:18 | 25 | MR. MEADOWS:  But they weren't going to repeat what |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

|           |    |                                                              |
|-----------|----|--------------------------------------------------------------|
| 11:15:22  | 1  | they were going to say because they were disparaged by the   |
| 11:15:25  | 2  | Government and they have no way to come back and say -- the   |
| 11:15:34  | 3  | Government has portrayed these witnesses as one-sided.        |
| 11:15:37  | 4  | THE COURT:  I didn't take it that way.  They don't need       |
| 11:15:41  | 5  | to be defending their character or their -- nobody impugned   |
| 11:15:46  | 6  | their character or anything else.  That's not necessary.  I want |
| 11:15:48  | 7  | to hear from somebody that I haven't already heard from and I |
| 11:15:52  | 8  | will be happy to hear from them, but I'm not going to hear from |
| 11:15:55  | 9  | somebody I've already heard from and they don't need to defend |
| 11:15:58  | 10 | themselves.  I didn't hear anybody being specifically trashed, |
| 11:16:00  | 11 | so please --                                                 |
| 11:16:03  | 12 | MR. MEADOWS:  I didn't mean the word disparaging as           |
| 11:16:08  | 13 | "trashed".  I should have said there are -- there's more to the |
| 11:16:12  | 14 | story than just what they have written on the paper as to     |
| 11:16:13  | 15 | Mr. Sergo.                                                    |
| 11:16:16  | 16 | THE COURT:  Anybody that hasn't written a letter that I       |
| 11:16:20  | 17 | have read, they're welcome to come speak.                    |
| 11:16:22  | 18 | MR. MEADOWS:  Yes, Your Honor.  Then the defense would        |
| 11:16:25  | 19 | call Ernie Hester.                                            |
| 11:16:31  | 20 | THE COURT:  Yes, sir.  Come forward, please.  Please          |
| 11:16:35  | 21 | take the lectern sir, and tell me what your name is please.   |
| 11:16:38  | 22 | THE WITNESS:  Good morning, Your Honor.  My name is           |
| 11:16:39  | 23 | Ernie Hester.                                                 |
| 11:16:41  | 24 | THE COURT:  Yes, sir.  What would you like to tell me?        |
| 11:16:44  | 25 | THE WITNESS:  I would like to speak on behalf of Bobby        |

| | |
|---|---|
| 11:16:51 | 1 |
| 11:16:54 | 2 |
| 11:16:56 | 3 |
| 11:16:57 | 4 |
| 11:16:59 | 5 |
| 11:17:05 | 6 |
| 11:17:08 | 7 |
| 11:17:12 | 8 |
| 11:17:17 | 9 |
| 11:17:24 | 10 |
| 11:17:30 | 11 |
| 11:17:38 | 12 |
| 11:17:48 | 13 |
| 11:17:50 | 14 |
| 11:17:54 | 15 |
| 11:17:58 | 16 |
| 11:18:03 | 17 |
| 11:18:09 | 18 |
| 11:18:17 | 19 |
| 11:18:25 | 20 |
| 11:18:32 | 21 |
| 11:18:35 | 22 |
| 11:18:42 | 23 |
| 11:18:44 | 24 |
| 11:18:45 | 25 |

Sergo.  I've known his family for quite a few years.

THE COURT:  How long have you known the Defendant?

THE WITNESS:  Probably about 10 to 12 years.

THE COURT:  All right.

THE WITNESS:  I knew him when he was a young man in high school and I would go into the family restaurant.

Your Honor, I was in law enforcement in Martin County for 32 years, been retired three or four years ago.  During that time, I would go into -- and I knew the family, the whole -- the entire family, including Bobby.  I would like to address the Court to say that I've never, in my career, 32 years in law enforcement, spoke on behalf of a Defendant in a case but here I am speaking on the behalf of the Defendant and his character and his family's character.

This young man, when he was a young man in high school, I thought so much of him, he would me and my colleagues and former law enforcement officers would go into the restaurant, he would always -- he was always a polite young man, he was always an inquisitive young man.  I thought so much of his family when he was, I think, a senior in high school, I gave him a firearm, with his parents' consent, to target practice.  And I've never done that before either.  That's how much I thought of him and his family and to be responsible.  Has he made mistakes?  Sure, we've all made mistakes in our life.

THE COURT:  This is a pretty big one.

11:18:51   1           THE WITNESS:  It is.  But I'm speaking on behalf of him

11:18:53   2     and his family and his children.

11:18:55   3           THE COURT:  I appreciate that.

11:19:00   4           THE WITNESS:  And to let the Court know that we -- even

11:19:07   5     though we make mistakes, we can always pick our things up and go

11:19:16   6     on with life.  And I would like to ask or request the Court to

11:19:23   7     have mercy on him because he is a good character, up until this

11:19:29   8     mistake, error in life.  He's got a good family.  He's got small

11:19:40   9     children, and he'll make something of his life.  He is a smart

11:19:44  10     young man.  Very intelligent.

11:19:46  11           THE COURT:  Thank you, sir.

11:19:48  12           THE WITNESS:  Yes, sir.

11:19:57  13           THE COURT:  Yes, sir.

11:20:00  14           MR. MEADOWS:  Your Honor, if I may please the Court,

11:20:05  15     Bobby Sergo, the gentleman that's before you, is -- you've read

11:20:05  16     the PSR.

11:20:08  17           THE COURT:  More than once.

11:20:10  18           MR. MEADOWS:  I was just going to say, at length and

11:20:13  19     probably more than once, and you know very well who Mr. Sergo

11:20:24  20     is.  And I myself in my capacity as ex-law enforcement retired,

11:20:31  21     and as a lawyer, deal with individuals that are of the criminal

11:20:37  22     element, in the criminal element and individuals that are of the

11:20:47  23     criminal mind.  And Bobby has committed a crime, he has never

11:20:54  24     denied that.  And in all of my years, almost 40 years in the

11:21:03  25     business, I've never met or dealt with a client, a defendant, of

11:21:10  1    this nature.  He has no record.  None whatsoever.  He has no

11:21:16  2    related cases.  Ironically, we are one year, as of yesterday,

11:21:19  3    from the date of his arrest that he's been in jail.

11:21:22  4             THE COURT:  I saw that.  January 17th?

11:21:25  5             MR. MEADOWS:  Yes, Your Honor, and today being the

11:21:25  6    18th.

11:21:26  7             THE COURT:  Yeah.

11:21:29  8             MR. MEADOWS:  Going into the jail for the past year and

11:21:39  9    I have been dealing with Mr. Sergo quite a lot.  I just didn't

11:21:43  10   see him once a month, I saw Mr. Sergo a lot more than that.  And

11:21:50  11   the reason being is you have individuals that they're in the

11:21:53  12   system, they know how the system is, the system is actually

11:22:02  13   comfortable for them.  Mr. Sergo's family has been the biggest

11:22:06  14   thing on his mind.

11:22:09  15            When Mr. Sergo was originally arrested, he didn't have

11:22:14  16   a lawyer.  He was at his house, they were serving a search

11:22:16  17   warrant.  All the things that the prosecution have already

11:22:20  18   talked about that were seized and what have you, I won't go into

11:22:25  19   that.  But when they sat Mr. Sergo down, he didn't say I want a

11:22:30  20   lawyer.  He didn't hem and haw, and he didn't say "I didn't do

11:22:37  21   it".  He didn't get an attitude, he answered all of the

11:22:48  22   questions that law enforcement had for him.  He went on, and in

11:22:54  23   meeting with me and then offering his proffered statement, he

11:23:03  24   did it without even hesitation.  There was no hesitation at all

11:23:10  25   as to "I know I've done wrong", and he has never not taken

| | | |
|---|---|---|
| 11:23:15 | 1 | responsibility for his actions whether he was in the midst of a |
| 11:23:21 | 2 | proffer or sitting in the 113 at the jail with me.  He has never |
| 11:23:27 | 3 | argued, he's never gotten at attitude about this. |
| 11:23:30 | 4 | And is he sorry that he is facing prison and going to |
| 11:23:34 | 5 | prison?  You have people stand before you and they say how sorry |
| 11:23:38 | 6 | they are for what they've done, and you have to look at them and |
| 11:23:43 | 7 | say "are you sorry because you're going to jail, or are you |
| 11:23:47 | 8 | sorry truly for what you've done.  Do you have remorse for what |
| 11:23:54 | 9 | you've done".  And I can stand up here and say that Bobby Sergo |
| 11:24:02 | 10 | has full remorse for what he's done and yes, he is afraid of |
| 11:24:08 | 11 | prison.  He doesn't want to go to prison like anybody wouldn't |
| 11:24:13 | 12 | want to, but I can tell you that a thousand times over him |
| 11:24:18 | 13 | worrying about himself, he's been worried about that family, all |
| 11:24:24 | 14 | of them.  Whether it's his mother, it's his father or his |
| 11:24:25 | 15 | children. |
| 11:24:30 | 16 | While he's been in jail, his baby boy, who is in the |
| 11:24:31 | 17 | courtroom, was born. |
| 11:24:33 | 18 | THE COURT:  Well, not anymore.  I think he's out there. |
| 11:24:35 | 19 | Out in the hallway now. |
| 11:24:36 | 20 | MR. MEADOWS:  He left. |
| 11:24:39 | 21 | THE COURT:  He had somewhere to go. |
| 11:24:44 | 22 | MR. MEADOWS:  He walked away at six months.  Bobby has |
| 11:24:50 | 23 | never met that boy.  He's never even -- because he's not allowed |
| 11:24:54 | 24 | in visitation, he's never seen him over the computer screen. |
| 11:24:58 | 25 | He's seen him on photographs that have been mailed into the jail |

|  |  |  |
|---|---|---|
| 11:25:13 | 1 | for him to see.  He walked in today, that's the first time he's |
| 11:25:27 | 2 | seen his son's face.  And I can tell you from being involved in |
| 11:25:28 | 3 | this case -- |
| 11:25:31 | 4 | MS. LINEBERGER:  Your Honor, I'm going to object to |
| 11:25:36 | 5 | attorney vouching for the Defendant personally.  I've remained |
| 11:25:36 | 6 | silent. |
| 11:25:38 | 7 | THE COURT:  I don't think he's vouching for him |
| 11:25:42 | 8 | personally.  I'll overrule the objection.  Go ahead. |
| 11:25:46 | 9 | MR. MEADOWS:  The birth of his child -- his daughter |
| 11:25:51 | 10 | was two when he was arrested, she's three now.  He hasn't seen |
| 11:25:56 | 11 | her since he's been placed in jail. |
| 11:26:05 | 12 | The fact that he had weapons and he had guns is part of |
| 11:26:16 | 13 | this case.  The gentleman stood up and mentioned that he |
| 11:26:25 | 14 | actually gave Bobby a handgun and that he used it for target |
| 11:26:30 | 15 | practice.  Well, I think one of the things that shows that |
| 11:26:33 | 16 | Mr. Sergo is not of the criminal mind is when you look at the |
| 11:26:37 | 17 | fact that he has all these guns, and all of the guns are |
| 11:26:43 | 18 | registered that he has, and the fact that he went to the state |
| 11:26:48 | 19 | of Florida and applied and has a carrying concealed firearm |
| 11:26:52 | 20 | permit.  Not something criminals do. |
| 11:26:55 | 21 | THE COURT:  Most criminals can't.  Most criminals have |
| 11:26:58 | 22 | felony records and can't legally possess a gun. |
| 11:27:01 | 23 | MR. MEADOWS:  And he doesn't have that record and he |
| 11:27:08 | 24 | was able to get that.  And he openly said I have firearms.  The |
| 11:27:13 | 25 | firearms were -- all the firearms that were found were found in |

| | | |
|---|---|---|
| 11:27:16 | 1 | constructive possession.  There was not any firearms found on |
| 11:27:20 | 2 | Mr. Sergo directly. |
| 11:27:23 | 3 | THE COURT:  Well, under the car seat he's sitting on is |
| 11:27:27 | 4 | pretty close.  And under the bed is close enough. |
| 11:27:29 | 5 | MR. MEADOWS:  As to the firearm that was under the bed, |
| 11:27:32 | 6 | Your Honor, that firearm had never been fired and there was no |
| 11:27:35 | 7 | ammunition in the house that actually even fit that firearm. |
| 11:27:37 | 8 | THE COURT:  That I don't know, but all I know is that |
| 11:27:40 | 9 | he had a firearm under his bed. |
| 11:27:41 | 10 | MR. MEADOWS:  Yes, Your Honor. |
| 11:27:45 | 11 | When you talk about -- |
| 11:27:47 | 12 | THE COURT:  That kind of troubles me with a toddler |
| 11:27:50 | 13 | walking around.  I don't know that there's no ammunition for |
| 11:27:53 | 14 | that gun.  That bothers me. |
| 11:27:55 | 15 | MR. MEADOWS:  But there was none, Your Honor. |
| 11:28:00 | 16 | But as far as acceptance of responsibility, as I stated |
| 11:28:06 | 17 | before, the Defendant, from day one, accepted the responsibility |
| 11:28:13 | 18 | of what he has done and he has talked to law enforcement openly |
| 11:28:20 | 19 | about what he's done.  He's been very truthful with law |
| 11:28:25 | 20 | enforcement.  He continues to this day working with law |
| 11:28:25 | 21 | enforcement. |
| 11:28:30 | 22 | This case has been talked about being a dark web case. |
| 11:28:37 | 23 | The dark web is -- obviously the government knows about the dark |
| 11:28:46 | 24 | web and has intel about the dark web, but Mr. Sergo has been |
| 11:28:50 | 25 | able to provide them with some of the processes that are used. |

25

| | | |
|---|---|---|
| 11:28:56 | 1 | As you were asking, was there advertisement on the dark web of |
| 11:29:00 | 2 | you can buy LSD here or something of that nature.  These are all |
| 11:29:07 | 3 | the types of things that they're learning.  And to coin one of |
| 11:29:12 | 4 | Ms. Lineberger's phrases, this case has not ripened.  The |
| 11:29:16 | 5 | information has not come to fruition with Mr. Sergo.  There is a |
| 11:29:22 | 6 | lot of information for the government to decipher.  Just the |
| 11:29:26 | 7 | information he's given to date, there's more to come. |
| 11:29:35 | 8 | The PSR stated that -- I think used the word clearly |
| 11:29:40 | 9 | demonstrated the fact that Mr. Sergo accepts the responsibility |
| 11:29:52 | 10 | for his actions.  In this particular case, Your Honor, the |
| 11:30:02 | 11 | remuneration for the activities was paid in Bitcoin, and this is |
| 11:30:06 | 12 | something that's on the news, it was on the news yesterday, it |
| 11:30:13 | 13 | fluctuates in value and goes up and down.  Bitcoin is in the |
| 11:30:18 | 14 | dark web hidden.  Your accounts are hidden more closely than if |
| 11:30:24 | 15 | you had a bank account at PNC Bank.  You can't find it. |
| 11:30:30 | 16 | Mr. Sergo didn't hesitate to tell law enforcement how he was |
| 11:30:36 | 17 | remunerated.  He didn't hesitate to tell them where that Bitcoin |
| 11:30:40 | 18 | was located.  They called it a wallet.  And he didn't hesitate |
| 11:30:44 | 19 | to give them the code to that wallet to get in it and remove it |
| 11:30:48 | 20 | and take it or do what they wanted to, and he relinquished it |
| 11:30:50 | 21 | immediately. |
| 11:31:02 | 22 | Bobby has no juvenile arrests, he has no adult arrests. |
| 11:31:08 | 23 | He was attending college.  He has zero criminal history points |
| 11:31:14 | 24 | in this case.  He's a Category 1, as you know. |
| 11:31:19 | 25 | One of the comments that Ms. Lineberger made is what's |

| | | |
|---|---|---|
| 11:31:25 | 1 | in the dark web will come out.  Well, it's because of |
| 11:31:30 | 2 | information that Mr. Sergo has already given and continues to |
| 11:31:36 | 3 | give that the information about the dark web will come out, and |
| 11:31:47 | 4 | that there are no two faces of Bobby Sergo as implied by Ms. |
| 11:31:52 | 5 | Lineberger, as though the community sees one side of him and |
| 11:31:58 | 6 | then there's this other darker side of him.  He did wrong.  He |
| 11:32:02 | 7 | admits that he committed crimes. |
| 11:32:08 | 8 | You have letters from individuals, Your Honor, that are |
| 11:32:19 | 9 | not just family members of Mr. Sergo, not just a preacher that |
| 11:32:26 | 10 | Mr. Sergo went to a service on Easter, but actually -- and he is |
| 11:32:33 | 11 | here in the courtroom, the man that was his reverend since he |
| 11:32:37 | 12 | was six years old and actually married he and his wife.  He |
| 11:32:39 | 13 | knows him spiritually. |
| 11:32:42 | 14 | You have leaders of the community that you have letters |
| 11:32:47 | 15 | from, and he is here in the courtroom, the director of the |
| 11:32:52 | 16 | Chamber of Commerce of Jensen Beach.  An ex-retired law |
| 11:32:55 | 17 | enforcement officer that's known Bobby since he was a young kid. |
| 11:32:58 | 18 | These are all professionals, Your Honor.  These are all people |
| 11:33:05 | 19 | that put their names and their positions here in front of you in |
| 11:33:12 | 20 | court and want you to know the good character of Bobby Sergo. |
| 11:33:17 | 21 | Yes, he committed a crime, but we're going to be asking |
| 11:33:27 | 22 | you, Your Honor, to understand that he is a 24-year-old with a |
| 11:33:35 | 23 | very young family that has committed a crime.  I won't say he's |
| 11:33:38 | 24 | made a mistake, but he did make a mistake, but he committed a |
| 11:33:45 | 25 | crime and has voiced to me that he knows there's a penalty to |

| | |
|---|---|
| 11:33:51 | 1 |
| 11:34:02 | 2 |
| 11:34:09 | 3 |
| 11:34:16 | 4 |
| 11:34:21 | 5 |
| 11:34:25 | 6 |

11:33:51  1    pay for that.  He knows there's a punitive nature to this and he

11:34:02  2    has no problem with serving that time.  We're just asking that

11:34:09  3    Your Honor think about his family, think about -- he is going to

11:34:16  4    lose that part of life, his 20s, to prison.  He's going to

11:34:21  5    continue to help the government and we're just asking that him

11:34:25  6    and his family don't grow up apart.

11:34:28  7              THE COURT:  All right, sir.  Thank you.

11:34:33  8              Does the Defendant wish to address me?

11:34:33  9              THE DEFENDANT:  Yes.

11:34:35  10             THE COURT:  All right.  Stay seated.  It's easier to

11:34:40  11   speak into the microphone.  Pull the microphone down.

11:34:45  12             THE DEFENDANT:  Your Honor, I'm humiliated and I'm very

11:34:51  13   remorseful for the crimes I've committed, and I'm ashamed of not

11:34:56  14   only the fact that I made the decisions to break the law when I

11:35:02  15   had opportunities to get an education and make something good

11:35:06  16   about my life, I took the easy way out and I betrayed and failed

11:35:13  17   my family.  I'm sorry mostly for the pain that I've caused them.

11:35:20  18   And, you know, I failed my wife as a husband, my children as a

11:35:30  19   father, and my parents as a son.  And it's not something I ever

11:35:39  20   thought, you know, I would do.  And I don't know if you're a

11:35:43  21   father, but I know that if you are, you would understand that I

11:35:54  22   love my family more than anything.  They need me as much as I

11:36:06  23   need them.  And I never meant anybody any harm.

11:36:14  24             I'm not a violent person.  I treated all my firearms

11:36:17  25   with respect.  The firearm that was underneath my bed was

```
11:36:21  1    unloaded.  I never purchased ammunition for it or else I would
11:36:26  2    never leave it there and even so, it was inaccessible with my
11:36:30  3    bed frame for my child to get anywhere near it.  All my other
11:36:39  4    firearms were treated with respect, and I've bought and sold
11:36:46  5    guns since I was of age because I enjoy target practice.
11:36:48  6             THE COURT:  What's the point of having an unloaded
11:36:52  7    rifle?  I mean, you might as well have a baseball bat.  What is
11:36:55  8    the point of having an unloaded rifle under your bed?
11:36:58  9             THE DEFENDANT:  To tell you the truth, I went to the
11:37:02  10   gun store because I used to go probably once a week when I would
11:37:04  11   go to the shooting range, and I saw it and I thought it was nice
11:37:08  12   looking -- you know, it was an interesting caliber.  It was a
11:37:14  13   300.  I was just interested and I purchased it.  But I never got
11:37:18  14   around to firing it or --
11:37:21  15            THE COURT:  Kind of hard with no ammunition.
11:37:22  16            THE DEFENDANT:  Yeah, I didn't purchase any ammunition.
11:37:26  17   I just brought it home.  I thought I would, you know, buy some
11:37:30  18   later and use it on my friend's property.  We used to go shoot
11:37:33  19   in Okeechobee in his backyard.
11:37:35  20            THE COURT:  All right.  Go ahead.
11:37:41  21            THE DEFENDANT:  I'm asking you please for a second
11:37:48  22   chance, and to have mercy on me today so that I can be there for
11:37:54  23   my family and my children and my wife, and I can make the right
11:38:03  24   choices because I've obviously made the wrong ones.  I'm sorry.
11:38:05  25            THE COURT:  You don't have to apologize to me, you have
```

| | | |
|---|---|---|
| 11:38:07 | 1 | to apologize to them. |
| 11:38:08 | 2 | THE DEFENDANT:  I apologize to them most of all, Your |
| 11:38:13 | 3 | Honor.  They're the people who are suffering the most because of |
| 11:38:14 | 4 | this. |
| 11:38:17 | 5 | THE COURT:  Absolutely.  Thank you, sir.  Anything |
| 11:38:18 | 6 | further? |
| 11:38:20 | 7 | THE DEFENDANT:  No, sir. |
| 11:38:22 | 8 | THE COURT:  Anything further from the defense? |
| 11:38:24 | 9 | MR. WANDNER:  One moment, sir? |
| 11:38:40 | 10 | Judge, if the Court has any questions as to the |
| 11:38:43 | 11 | guidelines or our recommendations which are set forth in the |
| 11:38:43 | 12 | memo. |
| 11:38:47 | 13 | THE COURT:  The guidelines are 40 years.  That's -- you |
| 11:38:49 | 14 | know, I'm going below the guidelines already. |
| 11:38:51 | 15 | MR. WANDNER:  Yes, Your Honor. |
| 11:38:52 | 16 | THE COURT:  So -- |
| 11:38:54 | 17 | MR. WANDNER:  We obviously appreciate that. |
| 11:38:57 | 18 | Judge, the guideline is 40 but again, it takes into |
| 11:39:03 | 19 | account -- you know, counsel got up and argued about all the |
| 11:39:06 | 20 | issues regarding the drugs and how -- |
| 11:39:08 | 21 | THE COURT:  We're not going to get into this whole back |
| 11:39:10 | 22 | and forth stuff, are we? |
| 11:39:12 | 23 | MR. WANDNER:  No, not at all.  Those are taken into |
| 11:39:16 | 24 | account by the guidelines and the guidelines, other than the |
| 11:39:21 | 25 | guns and the min-mans, were 70 to 87 months. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:39:22 | 1 | THE COURT:  But there were guns. |
| 11:39:23 | 2 | MR. WANDNER:  There were. |
| 11:39:23 | 3 | THE COURT:  Okay. |
| 11:39:28 | 4 | MR. WANDNER:  The question was, Judge, were those |
| 11:39:31 | 5 | needed to be charged in the case or not?  It's no longer a |
| 11:39:37 | 6 | relevant issue.  But they were, and I think the Court, to some |
| 11:39:42 | 7 | degree, has recognized that the application of those was very |
| 11:39:50 | 8 | beyond a normal case involving drug dealing of this kind, |
| 11:39:53 | 9 | especially with somebody with no priors would ever contemplate |
| 11:39:57 | 10 | such a sentence being applicable.  There were certainly |
| 11:40:01 | 11 | questions.  Yes, there were guns.  There's absolutely no |
| 11:40:05 | 12 | evidence in the case that they were ever actually used, pointed |
| 11:40:10 | 13 | at anybody.  There is no actual evidence that my  client had any |
| 11:40:13 | 14 | contact with any persons where a gun was ever even necessary. |
| 11:40:16 | 15 | There's no evidence that he had any individual contact with any |
| 11:40:18 | 16 | other people involved in the trade he was involved in. |
| 11:40:20 | 17 | And we're certainly not going to argue that he |
| 11:40:24 | 18 | shouldn't be punished for what he did, he certainly should. |
| 11:40:27 | 19 | He's expecting to be and we would never suggest, as counsel |
| 11:40:31 | 20 | perhaps stated, that we're asking to buy him a "get out of jail |
| 11:40:34 | 21 | free".  That's absolutely not what we're arguing.  We're |
| 11:40:37 | 22 | certainly expecting and asking the Court for a prison sentence, |
| 11:40:40 | 23 | just a reasonable one based upon what the guidelines for his |
| 11:40:42 | 24 | conduct and his lack of priors are. |
| 11:40:44 | 25 | THE COURT:  That's what I'm asking.  What do you think |

11:40:45  1    is a reasonable one?

11:40:46  2            MR. WANDNER:  Judge, in our memo we suggested 60

11:40:50  3    months.  Certainly we think that's reasonable.  But you know

11:40:52  4    what, Your Honor?  Anything in the guideline range in terms of

11:40:59  5    what the guidelines, irrespective of the min-mans which are no

11:41:02  6    longer something that -- Your Honor's hands are no longer tied

11:41:07  7    by them, the Court can give anywhere from zero to the 40 as

11:41:11  8    counsel stated.  But certainly, when you take out the issue of

11:41:15  9    the min-mans and their application in the case, you focus in on

11:41:19  10   what -- in our view what the guidelines would normally take into

11:41:23  11   account, irrespective of those things, and you're looking at a

11:41:27  12   70 month to 87 month range which takes into account everything

11:41:34  13   in the case.  No enhancements at all, no obstruction at all,

11:41:35  14   zero history, no arrests.

11:41:43  15           And of course, as counsel very eloquently stated, he

11:41:49  16   has provided cooperation that has basically opened up a world of

11:41:52  17   things for the government that they're just beginning to look

11:41:56  18   into.  There are, as counsel even alluded to, counsel for the

11:41:56  19   government --

11:41:58  20           THE COURT:  But they may amount to nothing.

11:42:01  21           MR. WANDNER:  Well no, it's amounted to enough already

11:42:03  22   that they filed their substantial assistance motion, 3553.

11:42:05  23           THE COURT:  That may be the reason that she filed the

11:42:07  24   motion.

11:42:10  25           MR. WANDNER:  Well, the fact is whatever he's done is

11:42:14  1    substantial, and the fact that they have law enforcement
11:42:17  2    agencies from around the world looking into this investigation
11:42:20  3    is because of what is provided.  And all we're asking, Judge, is
11:42:24  4    rather than start with 40 years as the beginning point where
11:42:29  5    this 25-year min-man is no longer applicable, brings us all the
11:42:33  6    way up there, and of course there were questions as to whether
11:42:38  7    there were or were not predicate acts, both min-mans were
11:42:38  8    needed.
11:42:41  9         But again, Your Honor now has the ability to reconcile
11:42:46  10   all of that now that the government has filed its 5K and the
11:42:50  11   3553.  We're asking for a reasonable sentence based upon his
11:42:54  12   specific characteristics, Judge, taking into account what he's
11:42:59  13   done which he's accepted responsibility for, and has very much
11:43:03  14   cooperated with the government.  Ultimately, Judge, it's the
11:43:06  15   young lady back there with that baby strapped around her body
11:43:08  16   that is really the victim.
11:43:12  17        THE COURT:  Baby is outside, but the baby went to get a
11:43:13  18   Coke.
11:43:14  19        MR. WANDNER:  Judge, we ask that the Court fashion a
11:43:19  20   sentence that brings this young man home to his young family in
11:43:24  21   a reasonable period so that when he sees them again, they're not
11:43:28  22   teenagers or adults of their own.  A 20-year sentence, he'll
11:43:32  23   never be a part of their life.  Let's be honest.  The young lady
11:43:37  24   will move on to other things, she won't wait, nor should she.
11:43:37  25   There is no reason.

11:43:41   1          What he has been accused of simply having guns, yes, I
11:43:43   2   agree with Your Honor having guns in the house, there's a lot of
11:43:46   3   people in Florida who have them.  Thankfully no violence has
11:43:51   4   been accused in this case, no accidents ever happened.  Again,
11:43:54   5   they were legally owned, legally purchased and he had government
11:43:58   6   authority to possess them.  Judge, there's nothing in this
11:44:01   7   record that would suggest a sentence that would destroy this
11:44:06   8   family like a 20-year sentence would do, or destroy this young
11:44:09   9   man and his young wife and his babies' lives --
11:44:12  10          THE COURT:  The thing that this side is ignoring and
11:44:18  11   this side is emphasizing is that the drug itself, although it is
11:44:22  12   not as common as it used to be, is still a drug that destroys
11:44:27  13   families.  It's still a drug that is very dangerous.  It's still
11:44:35  14   a drug that is illegal.  And he had, I don't know, I can't count
11:44:38  15   how many hits, but a lot.  An awful lot of people can be
11:44:39  16   affected by this.
11:44:43  17          Also the fact that it's being imported from other
11:44:46  18   countries and apparently being exported to other countries is a
11:44:49  19   factor.  This is a very serious case.
11:44:49  20          MR. WANDNER:  Absolutely.
11:44:51  21          THE COURT:  And your client is in the position where a
11:44:53  22   lot of smart kids are.  They think they're smarter than anybody
11:44:58  23   in the world.  I used to be the smartest kid in the room.  It
11:45:01  24   was a very small room, but I was the smartest kid in the room.
11:45:05  25   Then I got to college and I found out there were other people

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 11:45:08 | 1  | that were really smart, and I got to law school and I found         |
| 11:45:10 | 2  | there were other people that were brilliant.  Then I got to be a    |
| 11:45:14 | 3  | judge and I found out there were people that I can't even fathom    |
| 11:45:17 | 4  | how smart they are.  And the bottom line is that's part of          |
| 11:45:21 | 5  | growing up.  Unfortunately, your client has stepped in it long      |
| 11:45:22 | 6  | before he grew up.                                                  |
| 11:45:23 | 7  | MR. WANDNER:  You're right, Judge.                                  |
| 11:45:25 | 8  | THE COURT:  And he is in the position right now where               |
| 11:45:30 | 9  | his being smart is to his detriment because he is able to           |
| 11:45:34 | 10 | manipulate things and do things that other people can't do and      |
| 11:45:36 | 11 | it's got him in a mess, a hell of a mess.                           |
| 11:45:38 | 12 | MR. WANDNER:  True.  Every word.                                    |
| 11:45:41 | 13 | THE COURT:  And he can't just walk away from it.  He                |
| 11:45:44 | 14 | can't.  He's going to go to jail.  He's going to go to jail for     |
| 11:45:48 | 15 | a good term.  Now, he could help himself and he can help himself    |
| 11:45:53 | 16 | a lot, and I suspect that he will try.  And I am confident that     |
| 11:45:57 | 17 | the government, particularly I presume it's DEA that's             |
| 11:46:00 | 18 | marshalling this thing, but they will be the ones who will be       |
| 11:46:04 | 19 | determining whether -- or Customs, or whoever it is, Homeland       |
| 11:46:07 | 20 | Security, whatever the name of the agency is this week, you         |
| 11:46:11 | 21 | know, they'll do the best they can because they want to make the    |
| 11:46:16 | 22 | case too.  I hope that with the cooperation that he'll get a        |
| 11:46:19 | 23 | sentence reduction, and you'll be back here in a while asking       |
| 11:46:24 | 24 | for me to reduce the sentence, and I will.  But he has to have a    |
| 11:46:28 | 25 | -- this is a big case by any standard.  I will admit that I --      |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:46:31 1    you know, I used to be in the business of -- I was regional

11:46:36 2    director of one of the agencies that became DEA later on.  I

11:46:40 3    dealt with drugs a lot, and LSD was something that was a big

11:46:44 4    deal.  It's not a big a deal anymore, but it's still a very

11:46:47 5    dangerous drug.  It's a particularly dangerous drug because it

11:46:51 6    has no real value that I can know of other than hallucinations

11:46:56 7    and making people get out of their humdrum daily life.  I don't

11:47:00 8    know.  I kind of always thought that maybe being part of your

11:47:04 9    humdrum daily life is part of what makes you smarter as you get

11:47:06 10   older, but I don't know.

11:47:09 11         The bottom line is this is a very dangerous situation.

11:47:13 12   He could have ruined a lot of other families.  I mean, he's

11:47:17 13   talking about the value of his family to him up and down.

11:47:21 14   Parents and children and wife.  What about the other families

11:47:25 15   that might not have been as stable as his that couldn't

11:47:30 16   withstand this type of drug coming into their homes and coming

11:47:33 17   into their workplace?

11:47:35 18         MR. WANDNER:  Judge, I agree with everything you said,

11:47:39 19   and that's why I've been trying to focus in --

11:47:41 20         THE COURT:  He's going to jail.  Okay.  Let's talk

11:47:43 21   about how long.  I got to tell you that five years is not enough

11:47:47 22   at this point.  Five years might be enough after he's done a

11:47:51 23   good deed and done some good for the law enforcement, but at

11:47:57 24   this point, I don't think it is.

11:47:58 25         MR. WANDNER:  I'm glad, Your Honor, very glad Your

11:48:01  1   Honor is focusing in on the drugs.  You are right, it's a
11:48:04  2   serious thing, and he's never once denied that he put himself in
11:48:06  3   the situation.
11:48:08  4        THE COURT:  Then why did he do it?  For money?  Come
11:48:14  5   on.  He's smart enough to do other things. Everybody that has
11:48:18  6   talked about him has said what a congenial, amiable,
11:48:21  7   easy-to-get-along-with -- and I don't think anybody argues that
11:48:24  8   he's not smart.  He's smart as can be.
11:48:25  9        MR. WANDNER:  He obviously made a terrible mistake,
11:48:28  10  Judge, and he's going to pay for it.
11:48:29  11       THE COURT:  It's not like he was driving on the wrong
11:48:33  12  side of the road one time, he made a mistake, bang, a lot of
11:48:37  13  people got hurt.  No.  He did it over and over and over again
11:48:39  14  continuously for a long period of time for profit.
11:48:41  15       MR. WANDNER:  And the guidelines take that into
11:48:44  16  account, and that's why I think the Court -- I understand the
11:48:47  17  Court's position regarding 60 months, totally reasonable.  My
11:48:51  18  suggestion is the severity of the drug-related aspects of this
11:48:56  19  case are very much taken into account in what the guideline
11:48:59  20  sentence would be irrespective of the guns, which is 70 to 87
11:49:00  21  months.
11:49:02  22       THE COURT:  I can't ignore the guns.  I can't ignore
11:49:06  23  the guns because the guns were there, and I think the Eleventh
11:49:10  24  Circuit has spoken very clearly.  Proximity of a gun to a drug
11:49:13  25  transaction is substantial evidence of the fact that it was

| 11:49:17 | 1 | being used in furtherance of that drug transaction.  And I think |
| 11:49:21 | 2 | carrying -- I have a concealed weapon license.  I have had guns. |

11:49:17  1   being used in furtherance of that drug transaction.  And I think

11:49:21  2   carrying -- I have a concealed weapon license.  I have had guns.

11:49:25  3   I was in the Navy.  I'm an expert, whatever the heck it is.  If

11:49:28  4   a guy is standing at attention at seven yards, he's a dead man.

11:49:31  5   But if he's moving around or further than that, I got a problem.

11:49:35  6   But the bottom line is I know how to handle firearms.  I have a

11:49:38  7   license.  I have guns.  They're home.  I don't carry them in my

11:49:42  8   car.  I don't carry them under my bed.  You know, I have them

11:49:46  9   locked up because my kids are in their 40s now, but you know,

11:49:50  10  they were kids and I don't want to take any chances on that.  I

11:49:53  11  certainly didn't carry one under my -- especially with my

11:49:58  12  temper, I wouldn't carry a gun under the seat of my car.

11:49:59  13          MR. WANDNER:  Thankfully Judge, there is absolutely no

11:50:02  14  evidence that they were absolutely used.

11:50:05  15          THE COURT:  I didn't say he was.  I said he was

11:50:07  16  carrying it under the seat of his car and he was coming home and

11:50:11  17  he did, in fact, transport drugs because he had to take them

11:50:15  18  somewhere to get them shipped to Mexico, and he had to go

11:50:16  19  somewhere to pick them up.

11:50:18  20          I don't know.  The bottom line is the guns are there

11:50:20  21  and I'm not ignoring the guns.

11:50:21  22          MR. WANDNER:  My suggestion, Judge, under the

11:50:23  23  circumstances of where Your Honor is, I think where Your Honor

11:50:28  24  is thinking, perhaps a sentence either on the higher end of the

11:50:34  25  guideline which is 87 months, or even an additional period to

| | | |
|---|---|---|
| 11:50:37 | 1 | take into account some of your concerns about the firearms, Your |
| 11:50:42 | 2 | Honor.  Quite honestly, anything from ten years to below I think |
| 11:50:46 | 3 | would be a very, very reasonable sentence in this case, |
| 11:50:49 | 4 | certainly giving an opportunity for him, which he's clearly |
| 11:50:52 | 5 | ready, willing and able to do to continue his cooperation. |
| 11:50:54 | 6 | THE COURT:  I hope he is, because I think that he has |
| 11:50:56 | 7 | some value.  I've gotten letters from people I actually know |
| 11:51:03 | 8 | extolling his virtues, and I'm confident that he has redeeming |
| 11:51:09 | 9 | values.  But he better dig deep and find them and help so that |
| 11:51:14 | 10 | he can get his motion filed. |
| 11:51:16 | 11 | All right, sir.  Thank you. |
| 11:51:16 | 12 | MR. WANDNER:  Judge -- |
| 11:51:17 | 13 | THE COURT:  Anything else? |
| 11:51:19 | 14 | MR. WANDNER:  Housekeeping, Your Honor.  We had |
| 11:51:24 | 15 | suggested in our written memo a suggestion by the Court, |
| 11:51:26 | 16 | recommendation for a drug treatment program.  There's certainly |
| 11:51:29 | 17 | evidence in the case to warrant that.  I would ask the Court to |
| 11:51:29 | 18 | impose -- |
| 11:51:31 | 19 | THE COURT:  What is the evidence that he has a drug |
| 11:51:32 | 20 | problem? |
| 11:51:33 | 21 | MR. WANDNER:  I believe -- |
| 11:51:35 | 22 | THE COURT:  Other than the fact that he got caught |
| 11:51:38 | 23 | selling them or he got caught in possession of them. |
| 11:51:40 | 24 | MR. WANDNER:  I believe counsel indicated that he was |
| 11:51:42 | 25 | using at some point, I believe in the PSR. |

| | | |
|---|---|---|
| 11:51:45 | 1 | THE COURT:  Look, I don't have a problem with the |
| 11:51:50 | 2 | Bureau of Prisons screening him, but I'm not hopeful that |
| 11:51:53 | 3 | they'll give him a drug treatment program because I don't think |
| 11:51:57 | 4 | that he has a drug problem.  I think that he has a smarts |
| 11:52:01 | 5 | problem, but that's not my call.  I'll recommend to the Bureau |
| 11:52:02 | 6 | of Prisons they screen him. |
| 11:52:04 | 7 | MR. WANDNER:  Thank you, Judge.  Also, Your Honor did |
| 11:52:07 | 8 | grant the 5K.  I believe the Court still has to grant the |
| 11:52:08 | 9 | 3553(e). |
| 11:52:11 | 10 | THE COURT:  What's the 3553(e)?  I don't even know. |
| 11:52:13 | 11 | MR. WANDNER:  That allows the lowering of the min-man, |
| 11:52:14 | 12 | Judge. |
| 11:52:16 | 13 | THE COURT:  I granted their motion, whatever it is. |
| 11:52:19 | 14 | MR. WANDNER:  Understood.  Thank you very much, Judge, |
| 11:52:20 | 15 | for your time. |
| 11:52:21 | 16 | THE COURT:  Anything else?  I hesitate to ask, Ms. |
| 11:52:24 | 17 | Lineberger?  Is there anything else, Ms. Lineberger? |
| 11:52:26 | 18 | MS. LINEBERGER:  Your Honor -- |
| 11:52:27 | 19 | THE COURT:  I knew it.  I shouldn't have asked you. |
| 11:52:28 | 20 | Go ahead.  I'm sorry. |
| 11:52:30 | 21 | MS. LINEBERGER:  Your Honor, just the matter of the |
| 11:52:34 | 22 | forfeiture on top of the sentence and supervised release. |
| 11:52:37 | 23 | THE COURT:  What are we forfeiting, the Bitcoin? |
| 11:52:38 | 24 | MS. LINEBERGER:  Yes, Your Honor. |
| 11:52:42 | 25 | THE COURT:  And what, you don't want the Honda Odyssey, |

| | | |
|---|---|---|
| 11:52:43 | 1 | do you? |
| 11:52:43 | 2 | MS. LINEBERGER:  I'm sorry? |
| 11:52:47 | 3 | THE COURT:  You don't want his Honda Odyssey, do you? |
| 11:52:51 | 4 | Who wants a minivan?  Come on.  I don't think DEA wants it |
| 11:52:56 | 5 | either.  I don't have any forfeiture. |
| 11:52:59 | 6 | MS. LINEBERGER:  Your Honor, there was -- |
| 11:53:02 | 7 | THE COURT:  Did I do preliminary order of forfeiture, |
| 11:53:03 | 8 | Wanda? |
| 11:53:06 | 9 | MS. LINEBERGER:  Yes, dated July 14, 2017, which is at |
| 11:53:10 | 10 | Docket Entry 30, Your Honor.  We sought to forfeit currency, the |
| 11:53:17 | 11 | Bitcoins, as well as the firearms. |
| 11:53:21 | 12 | THE COURT:  All right.  I got, I have that.  Right.  I |
| 11:53:25 | 13 | have it in my oral presentation. |
| 11:53:25 | 14 | MS. LINEBERGER:  Yes, Your Honor. |
| 11:53:27 | 15 | THE COURT:  All right.  Thank you, Ms. Lineberger, for |
| 11:53:31 | 16 | your brevity. |
| 11:53:32 | 17 | MS. LINEBERGER:  You're welcome, Your Honor. |
| 11:53:34 | 18 | THE COURT:  The Court has considered the statements of |
| 11:53:36 | 19 | all the parties, the presentence report which contains the |
| 11:53:39 | 20 | advisory guidelines, and the statutory factors as set forth in |
| 11:53:42 | 21 | 18 USC section 3553(a). |
| 11:53:45 | 22 | It is the finding of the Court the Defendant is not |
| 11:53:47 | 23 | able to pay a fine. |
| 11:53:52 | 24 | Having granted the government's motion under 5K1.1 and |
| 11:53:59 | 25 | 18 USC Section 3553(e); is that correct Ms. Lineberger? |

11:54:00  1          MS. LINEBERGER:  Yes.

11:54:03  2          THE COURT:  Okay.  There is no minimum mandatory

11:54:11  3     sentence in this case.  I will be giving a sentence -- it is the

11:54:14  4     judgment of the Court that the Defendant, Ralph Robert James

11:54:17  5     Sergo, is committed to the Bureau of Prisons to be imprisoned

11:54:21  6     for 120 months.  This term consists of 60 months as to each of

11:54:25  7     Counts 1, 2 and 4 to be served concurrently with each other, and

11:54:29  8     30 months as to Count 3 to be served consecutively to the terms

11:54:34  9     imposed as to Counts 1, 2 and 4; and 30 months as to Count 5 to

11:54:37  10    be served consecutively to the term imposed in Count 3.

11:54:40  11         Upon release from imprisonment, the Defendant shall be

11:54:43  12    placed on supervised release for a term of five years.  This

11:54:46  13    term consists of five years to each of Counts 1 through 5, all

11:54:48  14    such terms to run concurrently.

11:54:51  15         Within 72 hours of release from the custody of the

11:54:53  16    Bureau of Prisons, the Defendant shall report in person to the

11:54:56  17    probation office in the district to which the Defendant is

11:55:01  18    released.  While on supervised release, the Defendant shall

11:55:06  19    comply with the mandatory -- excuse me -- and standard

11:55:11  20    conditions of supervised release which include not committing

11:55:15  21    any crimes, being prohibited from possessing a firearm or other

11:55:17  22    dangerous device, not unlawfully possessing a controlled

11:55:20  23    substance, and cooperation in the collection of DNA.

11:55:24  24         The Defendant shall also comply with the following

11:55:28  25    special conditions:  Permissible computer examination, substance

11:55:30  1    abuse treatment, financial disclosure requirement, employment

11:55:34  2    requirement, self-employment restriction and unpaid restitution,

11:55:37  3    fines or special assessments, all as noted in Part G of the

11:55:40  4    revised presentence report.

11:55:41  5         It is further ordered the Defendant shall pay

11:55:44  6    immediately to the United States a special assessment of $100 as

11:55:48  7    to each of Counts 1 through 5 for a total of $500.

11:55:51  8         The total sentence 120 months imprisonment, five years

11:55:54  9    supervised release, $500 special assessment.

11:55:57  10        The Defendant's right, title and interest in the

11:55:59  11   property identified in the preliminary order of forfeiture which

11:56:02  12   has been entered by this Court and incorporated by reference

11:56:04  13   herein is hereby forfeited.

11:56:07  14        Now that sentence has been imposed, does the Defendant

11:56:10  15   or his counsel object to the Court's finding of fact or the

11:56:11  16   manner in which sentence was pronounced?

11:56:12  17        MR. WANDNER:  No, Judge.

11:56:13  18        THE COURT:  There are no additional counts to be

11:56:15  19   dismissed, are there Ms. Lineberger?

11:56:16  20        MS. LINEBERGER:  No, Your Honor.

11:56:17  21        THE COURT:  All right.  You have the right to appeal

11:56:20  22   the sentence imposed.  Any notice of appeal must be filed within

11:56:22  23   14 days after the entry of the judgment.  If you're unable to

11:56:27  24   pay the cost of an appeal, you may apply for leave to appeal in

11:56:27  25   forma pauperis.

11:56:29  1          I will recommend to the Bureau of Prisons that he be

11:56:35  2     incarcerated as close to the Orlando area as is possible,

11:56:38  3     commensurate with his background and the offense of which he

11:56:39  4     stands convicted.

11:56:41  5          I also recommend that the Defendant be screened for

11:56:44  6     substance abuse problems and be referred to participate in an

11:56:47  7     appropriate drug education treatment program by the Bureau of

11:56:49  8     Prisons, which may include placement in the Residential Drug

11:56:54  9     Abuse Treatment Program, that is the 500-hour drug treatment

11:56:56 10     program, at a designated Bureau of Prisons institution.

11:56:58 11          Good luck to you, Mr. Sergo.

11:56:58 12          THE DEFENDANT:  Thank you, Your Honor.

11:57:00 13          THE COURT:  Thank you, sir.

11:57:02 14          MR. WANDNER:  Thank you, Your Honor, for your time

11:57:02 15     today, sir.

11:57:04 16          THE COURT:  Thank you.

11:57:04 17          (PROCEEDINGS CONCLUDED)

11:57:04 18                    C E R T I F I C A T E
                I certify that the foregoing is a correct transcript from the
11:57:04 19     record of proceedings in the above-entitled matter.

11:57:04 20     5/1/2020                /s/ Dawn M. Savino, RPR, CRR
                Date                    DAWN M. SAVINO, RPR, CRR

11:57:04 21

11:57:04 22

        23

        24

        25